UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROYALE HATCHER,

    Petitioner,

v.                                 Case No: 6:17-cv-1643-Orl-22GJK

SECRETARY, DEPARTMENT OF
CORRECTIONS, and ATTORNEY
GENERAL, STATE OF FLORIDA,

    Respondents.
_____/

## ORDER

THIS CAUSE is before the Court on Petitioner Royale Hatcher's Petition for Writ of Habeas Corpus ("Petition," Doc. 1) filed pursuant to 28 U.S.C. § 2254. Respondents filed a Response to the Petition ("Response to Petition," Doc. 15) in compliance with this Court's instructions. Petitioner filed a Reply to the Response to Petition ("Reply," Doc. 22).

Petitioner asserts two grounds for relief in the Petition. For the following reasons, the Petition will be denied as untimely.

### I.    Procedural History

Petitioner was charged with robbery with a firearm (Count One) and three counts of aggravated assault with a firearm (Counts Two, Three, and Four). (Doc. 16-1 at 45-47.) The State stipulated to a judgment of acquittal as to Counts Two and Four, and the trial court granted a judgment of acquittal as to those counts. (Doc. 16-2 at 81.) A jury

1

convicted Petitioner of Counts One and Three. (Doc. 16-1 at 82-83.) The trial court sentenced Petitioner to a thirty-year term of imprisonment for Count One and to a concurrent fifteen-year term of imprisonment for Count Three. (*Id.* at 28.) Petitioner appealed his conviction. On October 27, 2009, the Fifth District Court of Appeal of Florida ("Fifth DCA") affirmed *per curiam*. (Doc. 16-2 at 225.) Petitioner filed a motion for clarification, which was denied on December 4, 2009. (*Id.* at 232.) Mandate issued on December 23, 2009. (*Id.* at 234.)

On October 1, 2010,[1] Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, which he amended several times. (Doc. Nos. 16-3 at 2-39; 16-4 at 1-86; 16-5 at 1-82; 16-6 at 2-98.) The state court denied relief. (Doc. 16-7 at 110-20.) Petitioner appealed. The Fifth DCA affirmed in part and reversed for an evidentiary hearing on two claims. (Doc. 16-8 at 38.) The state court conducted an evidentiary hearing and denied relief on those claims. (Doc. 16-9 at 89-98.) Petitioner appealed, and the Fifth DCA affirmed *per curiam*. (Doc. 16-11 at 44.) Mandate issued on August 1, 2014. (*Id.* at 46.)

Petitioner filed a second Rule 3.850 motion on October 21, 2016, premised on

---

[1] This is the filing date under Florida law. *See Thompson v. State,* 761 So.2d 324, 326 (Fla. 2000) ("[H]enceforth we will presume that a legal document submitted by an inmate is timely filed if it contains a certificate of service showing that the pleading was placed in the hands of prison or jail officials for mailing on a particular date. . . . This presumption will shift the burden to the state to prove that the document was not timely placed in prison officials' hands for mailing."); *see also Crews v. Malara*, 123 So. 3d 144, 146 (Fla. 1st DCA 2013) (holding that the prison date stamp on the prisoner's petition rebutted presumption that it was delivered on the date contained on the certificate of service).

2

newly discovered evidence. (*Id.* at 48-84.) The state court denied the motion *inter alia* because Petitioner failed to demonstrate that he could not have discovered the newly discovered evidence within the applicable two-year limitations period with due diligence. (*Id.* at 101-03.) Petitioner appealed. The Fifth DCA affirmed *per curiam*. (*Id.* at 177.) Mandate issued on August 11, 2017. (*Id.* at 179.)

Petitioner filed the Petition on September 13, 2017. (Doc. 1.)

## II. FACTS ADDUCED AT TRIAL

On September 6, 2007, employees at the Kirkman Road Walmart ("Walmart") received their bi-weekly pay. (Doc. 16-1 at 148-53.) On the bi-weekly pay dates, Walmart allowed employees, who did not have their pay direct deposited, to cash their paychecks in the store at 7:00 a.m. at register eleven. (*Id.*) Every employee was aware of the procedure. (*Id.*)

Petitioner worked the day of the robbery and clocked out of work at 6:56 a.m. (*Id.* at 224.) Jabari Simmonds ("Simmonds"), one of Petitioner's co-defendants, also worked that day. (*Id.* at 225.)

As employees stood in line to cash their checks, at 7:10 a.m. a person wearing a white mask covering his entire head, carrying a gun, and shouting "get down" entered the store through the doors on the general merchandise side of the store and went directly to register eleven. (*Id.* at 153-60, 180-81, 190-96.) The individual in the mask ordered the clerk to give him the money at gunpoint. (*Id.*) In response, the clerk and several employees in the line ran toward the back of the store. (*Id.*)

The customer service manager, the service manager, an associate, and Darren

3

Wallace ("Wallace"), the assistant store manager, were standing near the service desk at that time. (*Id.* at 201-02.) Simmonds was standing beside Wallace. (Doc. 16-2 at 88.) All Walmart employees wore blue shirts, but sales associates and managers were required to wear khakis, and managers also had to wear a collared shirt. (Doc. 16-1 at 197-98.) Only managers had keys to open the registers. (*Id*. at 199-200.) The perpetrator ran straight to Wallace, who was standing approximately twenty feet from register eleven, and ordered Wallace to open the register. (*Id*. at 201-02.) Wallace opened the register, and the perpetrator took the till from the register and then fled the store through the general merchandise door, which reopens at 7:00 a.m. (*Id*. at 208-10.) The perpetrator took $23,699.30 from the register. (*id*. at 223.)

C.L. Gibson ("Gibson"), who was working that morning, exited the store on the general merchandise side when the perpetrator ran in with the gun. (*Id*. at 253-54.) Gibson called 911 and while waiting outside, observed a light-colored Monte Carlo pull up. (*Id*. at 254-55.) Gibson approached the vehicle, told the driver that the store was closed, and a few seconds later saw the perpetrator exit the store and enter the passenger side of the Monte Carlo. (Doc. Nos. 16-1 at 255; 16-2 at 1.) Gibson got the license plate number of the vehicle as it left the store. (Doc. 16-2 at 2.) Police determined that the vehicle belonged to Simmonds. (*Id.* at 48.)

Dominique Campbell ("Campbell"),[2] Simmonds' girlfriend, testified that she saw Petitioner in the apartment she shared with Simmonds and her brother, Earl Campbell,

---

[2] Campbell admitted that she was not testifying willingly but rather because she was subpoenaed by the State. (Doc. 16-2 at 10-11.)

4

Petitioner's other co-defendant, on the morning of the robbery.[3] (*Id*. at 4-6.) Campbell was awakened by men talking and laughter coming from her brother's bedroom. (*Id*. at 5.) When Campbell got up, her brother's bedroom door was closed; however, Campbell saw Petitioner alone in her brother's bedroom a few minutes later counting bundles of money when she passed by the room. (*Id.* at 5-7.) Campbell had seen Petitioner with Simmonds on other occasions and knew they worked together. (*Id.* at 6.) Simmonds arrived at the apartment approximately twenty minutes after Petitioner and Campbell's brother and after Campbell saw Petitioner counting the money. (*Id.* at 7, 13.) Campbell learned of the robbery from Simmonds when he arrived at the apartment. (*Id.* at 16.) Campbell did not see whether Petitioner took anything with him when he left the apartment. (*Id*. at 9.)

Police searched Campbell's apartment later that day and located a cash register till in Earl Campbell's dresser drawer. (*Id.* at 9, 28.) Campbell later gave police a box containing $7,710 that her brother gave her to return to police. (*Id.* at 33.) Petitioner's fingerprints were found on the passenger exterior window and passenger exterior door handle of Simmonds' vehicle. (*Id.* at 61.) Petitioner had ridden with Simmonds in the car a couple of times to work prior to the robbery. (*Id.* at 11.) Earl Campbell was identified as the get-away driver of Simmonds' vehicle. (*Id.* at 51.)

### III.    ANALYSIS

Pursuant to 28 U.S.C. § 2244:

(d)(1)   A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of

---

[3] Campbell indicated that they lived at the Home Groves on Clarcona Pointe Way. (Doc. 16-2 at 4.)

5

a State court. The limitation period shall run from the latest of --

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

28 U.S.C. § 2244(d)(1)-(2).

In the present case, the Fifth DCA denied Petitioner's motion for clarification after affirming his conviction on December 4, 2009. Petitioner then had ninety days, or through March 4, 2010, to petition the Supreme Court of the United States for writ of certiorari. *See* Sup. Ct. R. 13.[4] Thus, under § 2244(d)(1)(A), the judgment of conviction became final

---

[4]Rule 13 provides as follows:

The time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate (or its equivalent under local practice). But if a petition for rehearing is timely filed in the lower court by any party, the time to file the petition for a writ of certiorari for all parties (whether or not

6

on March 5, 2010, and Petitioner had through March 7, 2011,[5] absent any tolling, to file a federal habeas corpus petition. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) (holding that the one-year period of limitation does not begin to run until the ninety-day period for filing a petition for certiorari with the Supreme Court of the United States has expired).

Under § 2244(d)(2), the limitations period tolls during the pendency of "properly filed" state collateral proceedings. Prior to the filing of his state post-conviction motion on October 1, 2010, 210 days of the limitation period expired. The time tolled from October 1, 2010, through August 1, 2014, when mandate issued on appeal from the denial of Petitioner's first Rule 3.850 motion. Petitioner then had 155 (365 – 210 = 155) days remaining to timely file his federal petition, or through January 5, 2015.[6] Therefore, the Petition filed on September 13, 2017, is untimely under § 2244(d)(1)(A).

Petitioner contends § 2244(d)(1)(D) applies based on newly discovered evidence. (Doc. 22 at 1-2). In support of this contention, Petitioner argues that he did not discover that the prosecution had withheld exculpatory evidence until February 5, 2016, after

---

        they requested rehearing or joined in the petition for rehearing) runs from the date of the denial of the petition for rehearing or, if the petition for rehearing is granted, the subsequent entry of judgment.

Sup. Ct. R. 13(3).

    [5]The one-year limitation period concluded on March 5, 2011, a Saturday. Petitioner, therefore, had until the following Monday, March 7, 2011, to file timely file the petition.

    [6]The limitation period expired on January 3, 2015, a Saturday. Petitioner, therefore, had until the following Monday, January 5, 2015, to timely file the petition.

making a public records request. (*Id.*) On that date, the Orlando Police Department provided him with Lamour Welch's statement to police. (*Id.*) Petitioner notes that he filed his second Rule 3.850 motion on October 21, 2016, based on this newly discovered evidence. (*Id.*)

Under § 2244(d)(1)(D), the time for raising a claim runs from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." The Eleventh Circuit has held that "[t]he limitations period under § 2244(d)(1)(D) begins when the factual predicate of a claim could have been discovered using due diligence, not when it was actually discovered." *Melson v. Allen*, 548 F. 3d 993, 999 (11th Cir. 2008). "Due diligence means the petitioner 'must show some good reason why he or she was unable to discover the facts' at an earlier date." *Id.* (quoting *In re Boshears*, 110 F. 3d 1538, 1540 (11th Cir. 1997)). "Merely alleging that an applicant 'did not actually know the facts underlying his or her claim does not pass the test.'" *Id.* (quoting *In re Boshears*, 110 F. 3d at 1540). "Instead, the inquiry focuses on 'whether a reasonable investigation . . . would have uncovered the facts the applicant alleges are newly discovered.'" *Id.* (quoting *In re Boshears*, 110 F. 3d at 1540).

Assuming without deciding that Petitioner could not have discovered the facts supporting his claim with due diligence until February 5, 2016, Petitioner would have had until February 6, 2017, to timely file his Petition, absent any tolling under § 2244(d)(2). Petitioner filed his second Rule 3.850 motion on October 21, 2016. However, the state court found the post-conviction motion to be untimely because Petitioner could have discovered the newly discovered evidence within the two-year limitation period for filing

8

a timely Rule 3.850 motion. Consequently, Petitioner's second Rule 3.850 motion did not toll the limitations period. *See Jones v. Sec'y, Fla. Dep't of Corr.*, 906 F.3d 1339, 1349–50 (11th Cir. 2018), *cert. denied sub nom. Jones v. Inch*, 139 S. Ct. 1384, 203 L. Ed. 2d 618 (2019) (holding that the state court's determination that the petitioner's Rule 3.850 motion premised on newly discovered evidence was not timely filed was entitled to deference and therefore, the motion was not "properly filed" to toll the statute of limitations). The Petition filed on September 13, 2017, therefore, is untimely under § 2244(d)(1)(D).

To overcome his untimely filing, Petitioner maintains that he is actually innocent of the offenses. (Doc. 1 at 14.) A showing of actual innocence may relieve habeas petitioners from the burdens imposed by § 2244(d). *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). "A habeas petitioner asserting actual innocence to avoid a procedural bar must show that his conviction 'probably resulted' from 'a constitutional violation.'" *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

> To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

*Schlup*, 513 U.S. at 324. A petitioner asserting actual innocence to overcome the statute of limitations "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *McQuiggin*, 569 U.S. at 399 (quoting *Schlup*, 513 U.S. at 327). "Actual innocence means factual innocence, not mere legal insufficiency." *Beasley v. United States*, 523 U.S. 614, 615 (1998).

In assessing a claim of actual innocence, "'the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'" *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). Federal courts also "'may consider how the timing of the [evidentiary] submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'" *Id.* (quoting *Melson v. Allen*, 548 F.3d 993, 1002 (11th Cir. 2008)).

To demonstrate his actual innocence, Petitioner relies on (1) his direct deposit bank records, (2) the confession of Antonio Breedlove ("Breedlove"), (3) the statement of Lamour Welch ("Welch"), and (4) the statement of Amberlina Sabater ("Sabater"). (Doc. 1 at 5, 7.) Petitioner maintains that his direct deposit bank records refute the State's evidence that he did not have his checks direct deposited. (Doc. 16-7 at 112.) The three other pieces of evidence relied on by Petitioner are summarized as follows.

Breedlove, who was incarcerated for an unrelated robbery with a firearm, testified at Petitioner's evidentiary hearing on his first Rule 3.850 motion.[7] (Doc. 16-8 at 107-09.) Breedlove said that he did not know Petitioner prior to meeting him in prison in late 2010. (*Id.* at 111-12.) Breedlove testified that he learned that Petitioner was in prison for robbing

---

[7] In his first Rule 3.850 motion, Petitioner argued that Breedlove's confession constituted newly discovered evidence showing Petitioner's innocence. The state court conducted a hearing on the claim at which Petitioner, Breedlove, and Simmonds testified. The state court denied relief, concluding that Petitioner failed to show that the evidence would probably produce an acquittal or lesser sentence on retrial. (Doc. 16-9 at 90-93.) The state court found that Breedlove's testimony was not credible. (*Id.* at 93.)

the Kirkman Road Walmart on September 6, 2007, after overhearing Petitioner talking with another inmate. (*Id.* at 112-17.) Breedlove said he realized that the robbery that Petitioner was talking about was one that he had participated in. (*Id.* at 115-16.) On October 18, 2011, Breedlove signed an affidavit attesting that he, not Petitioner, committed the robbery. (*Id.* at 117.)

Breedlove testified that he committed the robbery with Earl Campbell and Simmonds and that it was Simmonds' idea to commit the robbery. (*Id.* at 117-18.) According to Breedlove, he met Earl Campbell and Simmonds at a party approximately two months before September 2007. (*Id.* at 110-11, 118.) Breedlove said that Simmonds provided him details about the managers who would be there at the time of the robbery. (*Id.* at 119.)

Breedlove testified that the plan was for Earl Campbell to be the driver, Breedlove to commit the robbery with a gun, and for Simmonds to be standing by the manager in case there was a problem with the register. (*Id.* at 125.) Breedlove said that Earl Campbell drove him to the store and Breedlove entered the Walmart from the general merchandise side wearing a white Michael Myers mask. (*Id.* at 127, 145.) Breedlove maintained he ran to register eleven with the gun in his hands yelling that everyone needed to get down. (*Id.* at 129.) Breedlove said he did not see Simmonds when he went to register eleven. (Id. at 143.) Breedlove testified that when the person working register eleven ran away, he looked for the manager that Simmonds previously had shown him and ordered him to open the register. (*Id.* at 129, 143-44.) Breedlove indicated that he took the till from the register when the manager opened it, ran out the general merchandise door, entered

11

Simmonds' vehicle, and went back to Simmonds' apartment. (*Id.* at 130-31.) According to Breedlove, they counted the $23,699 in Earl Campbell's room, he gave Earl and Simmonds each $5,000, and he kept the remainder. (*Id.* at 132-33.) Breedlove said that he did not see Dominique Campbell in the apartment that morning. (*Id.* at 133.)

Breedlove testified that the day before the robbery, he saw Simmonds arguing in the Walmart parking lot about a girl with a person who was wearing a Walmart ID with the name Roy on it. (*Id.* at 121.) Breedlove maintained that he was in Simmonds' car with Earl Campbell at the time of the argument. (*Id.*) Breedlove stated that Simmonds was angry when he entered the car and said that if things went wrong the following morning, he planned to falsely accuse Roy of the offense. (*Id.* at 123.) Breedlove said he had a teardrop tattoo on the right side of his face on the date of the robbery; however, he admitted that he does not have a teardrop tattoo on his right eyelid.[8] (Doc. 16-8 at 145.) Petitioner testified at the evidentiary hearing that he and Simmonds got into a fight over a girl in the Walmart parking lot on the night of September 5, 2007. (Doc. 16-8 at 165-66.)

Simmonds testified at the evidentiary hearing that he entered a plea to robbery with a firearm on August 29, 2008, and received a six-year sentence. (Doc. 16-9 at 9, 11.) Pursuant to the plea agreement, Simmonds could have received a lesser sentence if he had testified against Petitioner, but Simmonds chose not to do so. (*Id.* at 11.) Simmonds told police that Petitioner asked to use his car to commit a robbery at Walmart and

---

[8] Breedlove admitted that the Florida Department of Corrections did not note the tattoo on his description when he entered prison and explained that he had it retouched after entering prison because it was hardly visible. (Doc. 16-8 at 145-46.)

intended to give Simmonds part of the money. (Doc 16-8 at 176-78.) Simmonds said that Petitioner planned to run into the store around 7:00 a.m. (178.) Simmonds told the police that it was possible that the person who came into Walmart was Petitioner. (Doc. 16-9 at 1.) Simmonds said that Petitioner called him after the robbery and came to Simmonds' apartment at which time they counted the money and Petitioner gave him $5,000. (*Id*. at 2.)

Simmonds testified that what he told the police was the truth. (*Id*. at 3-4.) Simmonds said he did not know that Petitioner planned to commit the robbery on September 6th and indicated that he was talking to the manager near the register at the time of the robbery. (*Id*. at 4-5, 10.) In contrast to Breedlove's testimony, Simmonds testified that he did not know Breedlove and had never met him. (Doc. 16-9 at 6-7.) Contrary to Breedlove's and Petitioner's testimony, Simmonds denied that he argued with Petitioner over a girl. (*Id*. at 7.) Simmonds also testified that at the time of the robbery, his and Petitioner's relationship was all right. (*Id*. at 12.)

In his second Rule 3.850 motion, Petitioner asserted he was entitled to a new trial based on the prosecution's failure to disclose favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[9] (Doc. 16-11 at 58.) Petitioner's claim was premised on Welch's September 6, 2007 statement to the Orlando Police Department. In the statement, Welch indicated that Breedlove, who was her boyfriend, called her around 7:25 a.m. that

---

[9] This ground is Petitioner's first ground for relief in this habeas action. (Doc. 1 at 5.)

day, asked her to pick him at the Clarcona Groves Apartments, and she did so at 7:40 a.m. (Doc. 11 at 17.) Welch said that Breedlove asked her to stop and help him count a bag of money. (*Id.*) Welch maintained that she counted approximately $13,000 and saw a receipt of some sort from the Walmart accounting office. (*Id.*) Welch indicated that when she asked him where he got the money, Breedlove told her that he, Earl, and Jabari had just robbed the Walmart on Kirkman Road. (*Id.*) Welch said that Breedlove had a black gun with him and that she remembered overhearing him, Earl, and Jabari planning to rob Jabari's manager on payday at a party at her house a few weeks prior to that date.[10] (*Id.*) Petitioner also filed Welch's Certification of Death, indicating that she died on August 9, 2015. (Doc. 11 at 30.)

Finally, Petitioner relies on Sabater's written statement to police. Sabater, a Walmart employee present on the morning of the offenses, said that five guys wearing masks and carrying guns committed the offenses. (Doc. 11 at 36.) She further indicated that the perpetrator had a teardrop tattoo on his right eyelid. (*Id.*)

Viewing all the evidence, new and old, the Court concludes that Petitioner has not shown that it is more likely than not that no reasonable juror would have convicted him

---

[10] The state court found Petitioner's claim to be untimely because Welch's statement did not constitute newly discovered evidence under Florida law. (Doc. 16-11 at 102-03.) The state court reasoned that Petitioner made the public records request on January 27, 2016, and with due diligence, he could have discovered the statement within the two-year period for filing a Rule 3.850 motion. (*Id.*) Of note, Petitioner did not assert in the state trial court, as he did on appeal and as he does in this Court, that he had made a public records request to the Orlando Police Department in 2010 but did not receive Welch's statement in response to the request. *See* Doc. 16-11 at 61-65.

in the light of the new evidence. First, Petitioner's direct deposit bank records were available to him at the time of trial and do not constitute new evidence. Furthermore, the bank records are not exculpatory. The evidence presented at trial established that all Walmart employees knew of the check cashing procedure. Therefore, whether Petitioner direct deposited his checks or cashed them at work does not demonstrate that Petitioner is actually innocent.

Likewise, Sabater's statement to police is inherently incredible and does not support Petitioner's actual innocence. Sabater said there were five masked gunman who robbed the store when there is no question based on all the evidence that there was only one masked gunman. Furthermore, Sabater maintained that one of the masked perpetrators had a teardrop tattoo on his right eyelid. However, neither Petitioner nor Breedlove had a teardrop tattoo on his right eyelid. Thus, Sabater's statement does not show that Petitioner is actually innocent.

The Court further agrees with the state court's finding that Breedlove's testimony was not credible. First, Breedlove was a convicted felon when he confessed to the offenses. More importantly, Breedlove had nothing to lose by confessing to the offenses. The offenses were committed on September 6, 2007. Although Breedlove met Petitioner in late 2010, he waited until October 2011 to prepare his affidavit confessing to the offenses. Conveniently, the statute of limitations for the robbery with a firearm expired approximately one month before Breedlove chose to confess. *See* Fla. Stat. § 775.15(2)(a) (2007). Likewise, the statute of limitations for the other offenses expired in 2010. *See* Fla. Stat. § 775.15(2)(b) (2007).

Furthermore, Simmonds' testimony contradicted Breedlove's testimony. From review of the 3.850 hearing transcript, Simmonds clearly did not want to testify against Petitioner. Nevertheless, Simmonds admitted that the statement he made to police implicating Petitioner in the offenses was true. Furthermore, Simmonds denied that he knew Breedlove or that he had argued with Petitioner prior to the offenses. There is no discernible reason why Simmonds would have lied about Breedlove's participation in the offenses. Moreover, it stretches credulity that (1) Simmonds and Petitioner argued the night before the offenses, and Breedlove, who denied ever knowing Petitioner before meeting him in prison, fortuitously was there and remembered the nametag of the individual Simmonds argued with more than four years after the incident, (2) Simmonds was so angry after the purported argument that he planned to frame Petitioner for the offenses, yet when given the opportunity to testify against Petitioner to receive a lesser sentence, he did not do so, and (3) Simmonds and Petitioner had an argument so severe that Simmonds planned to frame Petitioner, yet Petitioner went to Simmonds apartment on the morning of the robbery.

With respect to Welch's statement, the Court finds that several facts call its authenticity and credibility into question. First, Petitioner did not discover the statement until approximately eight years after it was written, and mere months after Welch's death, although seemingly the Orlando Police Department did not fail to disclose anything else but this document. Moreover, Petitioner waited approximately eight months after receiving the statement before he took any action. In addition, the statement does not indicate that Welch showed any form of identification to the officer who

purportedly took the statement. *See* Doc. 11 at 17. In contrast, Sabater's statement included her Florida identification number on it. *See id.* at 36. Finally, Welch's statement indicates that Petitioner called her on the morning of the offenses around 7:25 and she picked him up around 7:40 at an apartment complex located in Orlando. However, Welch listed her address on the statement as 4010 34th Ave., Saint Petersburg, Florida.

More importantly, even accepting the authenticity and veracity of Welch's statement, her statement does not refute Campbell's testimony that Petitioner was at her apartment with Earl Campbell on the morning of the offenses counting bundles of money. A jury hearing the testimony of Campbell, Simmonds, Welch, and Breedlove could determine that Petitioner, Breedlove, Simmonds, and Earl Campbell committed the offenses. Consequently, for all these reasons, the Court concludes that Petitioner has not shown that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Therefore, Petitioner has not demonstrated that he is factually innocent to overcome his untimely filing of the Petition.

Any of Petitioner's allegations that are not specifically addressed herein have been found to be without merit.

### III. CERTIFICATE OF APPEALABILITY

This Court should grant an application for certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Sec'y Dep't of Corr.*,

568 F.3d 929, 934 (11th Cir. 2009). When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a petitioner demonstrates "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*; *Lamarca*, 568 F.3d at 934. However, a prisoner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Petitioner has not demonstrated that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. Moreover, Petitioner cannot show that jurists of reason would find this Court's procedural rulings debatable. Petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, the Court will deny Petitioner a certificate of appealability.

Accordingly, it is hereby **ORDERED** and **ADJUDGED:**

1. The Petition (Doc. 1) is **DENIED,** and this case is **DISMISSED with prejudice**.

2. Petitioner's Motion to Hear and Rule and for Summary Judgment (Doc. 25) is **DENIED**.

3. Petitioner is **DENIED** a Certificate of Appealability.

4. The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

**DONE** and **ORDERED** in Orlando, Florida on September 30, 2019.

ANNE C. CONWAY
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party